1  Sheri Pan (SBN 316136)
   sheri@zwillgen.com
2  ZWILLGEN LAW LLP
   369 Pine Street, Suite 506
3  San Francisco, CA 94104
   Telephone: (415) 590-2335
4
5  Dana J. Brusca (*pro hac vice*)
   dana@zwillgen.com
6  **ZWILLGEN PLLC**
   1900 M Street NW, Suite 250
7  Washington, DC 20036
   Telephone: (202) 296-3585
8  Facsimile: (202) 706-5298
9
   Attorneys for Defendant
10 **YANKA INDUSTRIES, INC. d/b/a**
   **MASTERCLASS**
11
12              **UNITED STATES DISTRICT COURT**
13            **NORTHERN DISTRICT OF CALIFORNIA**
14
15 ELIZABETH MALATY-UHR,                    Case No. 3:24-cv-05264-JD
16          *Plaintiff*,                    **DEFENDANT YANKA INDUSTRIES,**
                                            **INC. d/b/a MASTERCLASS'S NOTICE OF**
17        v.                                **MOTION AND MEMORANDUM OF**
                                            **POINTS AND AUTHORITIES IN**
18                                          **SUPPORT OF MOTION TO COMPEL**
   YANKA INDUSTRIES, INC. d/b/a             **ARBITRATION AS TO PLAINTIFF**
19 MASTERCLASS                              **MALATY-UHR**
20        *Defendant*.
                                            Judge:        Hon. James Donato
21                                          Hearing Date: January 23, 2025
                                            Time:         10:00 a.m.
22                                          Courtroom:    11, 19th Floor
23
24
25
26
27
28

1

**TO THE COURT AND ALL PARTIES OF RECORD:**

2

**PLEASE TAKE NOTICE THAT** on January 23, 2025, or as soon thereafter as this

3

matter may be heard, before the Honorable James Donato in Courtroom 11 of this Court, located

4

on the 19th Floor of the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA

5

94102, Defendant Yanka Industries, Inc. d/b/a MasterClass ("Defendant" or "MasterClass") will,

6

and hereby does, move this Court for an order compelling Plaintiff Elizabeth Malaty-Uhr to

7

bring her claims in arbitration. This Motion is authorized pursuant to Section 3 of the Federal

8

Arbitration Act ("FAA"), 9 U.S.C. § 3, on grounds that Plaintiff entered into an enforceable

9

arbitration agreement that requires arbitration of Plaintiff's causes of action as alleged in the

10

Seconded Amended Complaint.

11

This Motion will be based upon this Notice; the accompanying Memorandum of Points

12

and Authorities; the Declaration of Abhimanyu Vasishth; the complete record in this action; and

13

such other matters and arguments as may come before the Court, including those raised in

14

connection with reply briefing and oral argument relating to this Motion.

15

16

Dated: November 14, 2024

**ZWILLGEN PLLC**

17

By:  _/s/ Dana Brusca_____
    Dana Brusca (*pro hac vice*)

18

    dana@zwillgen.com
    Sheri B. Pan

19

    sheri@zwillgen.com

20

21

**Attorney for Defendant**
Yanka Industries, Inc. d/b/a MasterClass

22

23

24

25

26

27

28

DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD

# TABLE OF CONTENTS

I.  BACKGROUND ................................................................................................. 1

    A.  The Putative Class Action .................................................................... 1

    B.  The Arbitration Agreement Between MasterClass and Malaty-Uhr. .................. 2

        1.  *The Subscription Purchase Process* ....................................... 2

        2.  *The MasterClass Terms of Service.* ........................................ 5

II.  ARGUMENT ................................................................................................... 6

    A.  The Federal Arbitration Act Governs the Arbitration Agreement. ...................... 7

    B.  The FAA Limits the Scope of the Court's Inquiry. ..................................... 8

    C.  There is An Arbitration Agreement As Malaty-Uhr Assented to the
        Terms. ........................................................................................ 8

        1.  *A Typical Consumer Expects An Ongoing Relationship with
            MasterClass.* ................................................................ 10

        2.  *Malaty-Uhr Received Visually Conspicuous Notice of the
            Terms.* ...................................................................... 11

    D.  Malaty-Uhr's Claims Are Within the Scope of the Arbitration
        Agreement. .................................................................................. 14

        1.  *The Parties Delegated Arbitrability to the Arbitrator.* ........................ 14

        2.  *Malaty-Uhr's VPPA Claims Are Arbitrable.* ............................... 15

III.  CONCLUSION ............................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Ajzenman v. Off. of Comm'r of Baseball,*
   2020 WL 6037140 (C.D. Cal. Sept. 14, 2020) ...................................................................9

*Allied-Bruce Terminix Cos. v. Dobson,*
   513 U.S. 265 (1995) ............................................................................................................7

*AT&T Mobility LLC v. Concepcion,*
   563 U.S. 333 (2011) ............................................................................................................7

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
   475 U.S. 643 (1986) ..........................................................................................................15

*Atencio v. TuneCore, Inc.,*
   769 F. App'x 432 (9th Cir. 2019) .....................................................................................15

*B.D. v. Blizzard Ent., Inc.,*
   76 Cal. App. 5th 931 (2022) ........................................................................................10, 13

*Ben-Avi v. Experian Info. Sols,*
   2024 WL 3610972 (S.D. Cal. July 31, 2024) .....................................................................7

*Berkson v. Gogo LLC,*
   97 F. Supp. 3d 359 (E.D.N.Y. 2015) ..................................................................................9

*Berman v. Freedom Fin. Network, LLC,*
   30 F.4th 849 (9th Cir. 2022) ...........................................................................9, 11, 12, 13

*Brennan v. Opus Bank,*
   796 F.3d 1125 (9th Cir. 2015) ............................................................................................8

*Chien v. Bumble Inc.,*
   641 F. Supp. 3d 913 (S.D. Cal. 2022) .........................................................................13, 18

*Citizens Bank v. Alafabco, Inc.,*
   539 U.S. 52 (2003) ..............................................................................................................7

*Dean Witter Reynolds, Inc. v. Byrd,*
   470 U.S. 213 (1985) ............................................................................................................7

*Dohrmann v. Intuit, Inc.,*
   823 F. App'x 482 (9th Cir. 2020) .......................................................................................9

*Ferguson v. Corinthian Colls., Inc.,*
   733 F.3d 928 (9th Cir. 2013) ..............................................................................................7

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

*First Options of Chicago, Inc. v. Kaplan,*
    514 U.S. 938 (1995) ................................................................................................8

*Ghazizadeh v. Coursera, Inc.,*
    2024 WL 3455255 (N.D. Cal. June 20, 2024) ..............................................13, 19

*Heckman v. Live Nation Ent., Inc.,*
    2024 WL 4586971 (9th Cir. Oct. 28, 2024) .............................................................6

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
    586 U.S. 63 (2019) ................................................................................................14

*Howsam v. Dean Witter Reynolds, Inc.,*
    537 U.S. 79 (2002) ..................................................................................................8

*Keebaugh v. Warner Bros. Ent. Inc.,*
    100 F.4th 1005 (9th Cir. 2024) ...........................................................8, 9, 10, 12, 13

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.,*
    363 F.3d 1010 (9th Cir. 2004) ................................................................................7

*Macias v. Excel Bldg. Servs. LLC,*
    767 F. Supp. 2d 1002 (N.D. Cal. 2011) .................................................................8

*Meyer v. Uber Techs., Inc.,*
    868 F.3d 66 (2d Cir. 2017) .....................................................................................9

*Mohamed v. Uber Techs., Inc.,*
    848 F.3d 1201 (9th Cir. 2016) .........................................................................14-15

*Momot v. Mastro,*
    652 F.3d 982 (9th Cir. 2011) ...........................................................................14, 15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983) ...............................................................................................7, 15

*Nguyen v. Barnes & Noble Inc.,*
    763 F.3d 1171 (9th Cir. 2014) ............................................................................9, 11

*Peter v. DoorDash, Inc.,*
    445 F. Supp. 3d 580 (N.D. Cal. 2020) ...................................................................8

*Pizarro v. QuinStreet Inc.,*
    2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) .................................................13, 17

*Rent-A-Ctr., W., Inc. v. Jackson,*
    561 U.S. 63 (2010) ................................................................................................14

*United States v. Jackson,*
    851 F. App'x 35 (9th Cir. 2021) .............................................................................7

DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD

*Whalen v. Facebook, Inc.*,
    2022 WL 19934419 (N.D. Cal. Apr. 11, 2022) ........................................................................9

**Statutes**

9 U.S.C. §§ 1-16 (FAA) ..............................................................................................*passim*

9 U.S.C. § 2 ...............................................................................................................................7

18 U.S.C. § 2710 (VPPA) .........................................................................................1, 2, 6, 14, 15

DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD

Defendant Yanka Industries, Inc. d/b/a MasterClass ("MasterClass") is a subscription-based streaming platform that offers more than two hundred online classes taught by industry leaders and experts.  Instructors like YoYo Ma (music), Spanx's Sara Blakely (business & entrepreneurship), and Neil deGrasse Tyson (science & technology), share their insights, tools and lived experiences with subscribers in flexible format classes.

Plaintiff Elizabeth Malaty-Uhr alleges she is a MasterClass subscriber, and that MasterClass unlawfully shared her video viewing information in violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), by using commonplace analytic tools offered by Meta and Google on the MasterClass website.

She has it right in one respect:  Malaty-Uhr is a paying MasterClass subscriber.  But in purchasing that subscription, Malaty-Uhr assented to MasterClass's terms of service and agreed that nearly all disputes between her and MasterClass—including the claims alleged here (ECF 17)—be resolved through binding arbitration on an individual basis and not as part of a class.

Malaty-Uhr manifested her assent to the terms by clicking a button below a notice informing her in contrasting, hyperlinked text that, by clicking, she was agreeing to the MasterClass terms. Those terms, in turn, prominently and repeatedly disclosed the arbitration and class action waiver provisions, which required resolution of most disputes (including all alleged in the Second Amended Complaint ("SAC")) by arbitration.  Malaty-Uhr could have opted out of these arbitration provisions but did not.  Because Malaty-Uhr agreed to resolve her disputes with MasterClass individually in arbitration, this Court should compel her to do so.[1]

## I.    BACKGROUND

### A.    The Putative Class Action.

MasterClass operates the website www.masterclass.com, which features instructional and educational videos.  SAC ¶ 24.  The only way to access the video lessons is through a paid

---

[1] Because this motion to compel is filed as to Malaty-Uhr only (and not Plaintiff Alan Silva), the Court will need to decide MasterClass's contemporaneously filed motion to dismiss (ECF 24) regardless of its decision here.  As to Plaintiff Malaty-Uhr, MasterClass files these motions in the alternative, but submits that the Court may, as a matter of judicial economy, resolve MasterClass's motion to dismiss first and, only if the SAC survives, decide this motion to compel.

DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-CV-05264-JD

subscription to masterclass.com.[2]  *See id.* ¶ 59.  To obtain a subscription, MasterClass website visitors must supply the company with contact and payment information.  *Id.*

The SAC alleges that MasterClass uses two tools, the Meta Pixel and a Google tool on portions of its website:  The Meta Pixel is allegedly present on MasterClass's subscription webpages (where people sign up and pay for a MasterClass subscription) and the Google technology is allegedly present on MasterClass's webpages featuring video content.  *See id.* ¶¶ 60, 66.  The SAC alleges that MasterClass violates the VPPA because it shared with Meta the fact that Malaty-Uhr purchased a MasterClass subscription in December 2023, and further shared certain video viewing information with Google when she used her MasterClass subscription to request or obtain video content.  *Id.* ¶¶ 18, 63.  Plaintiff seeks statutory damages of $2,500 "per violation" and equitable relief for the allegedly unlawful conduct that occurred from her use of the MasterClass website.  *Id.* ¶¶ 85, 96.  These claims are subject to Malaty-Uhr's arbitration agreement with MasterClass.

**B.  The Arbitration Agreement Between MasterClass and Malaty-Uhr.**

Malaty-Uhr agreed to MasterClass's terms of service, including the mandatory arbitration provision, when she purchased a MasterClass subscription on December 29, 2023.  *See* Declaration of Abhimanyu Vasishth In Support of MasterClass's Motion to Compel ("A.V. Decl.") ¶¶ 16-17, 20.  The terms of service then in effect, to which Malaty-Uhr agreed, were dated September 27, 2023 (the "Terms of Service" or "Terms").  *Id.* ¶ 17.  The September 27, 2023 Terms are the only terms relevant to this motion because the September 27, 2023 Terms remain MasterClass's current terms and have not been revised since their adoption on September 27, 2023.[3]  *Id.*

**1.  *The Subscription Purchase Process.***

To purchase a MasterClass subscription, Malaty-Uhr had to visit the MasterClass website and navigate to a page with information about the different subscription plans MasterClass offered.  On

---

[2] A MasterClass subscription is always paid.  A.V. Decl. ¶ 4 However, some MasterClass subscribers receive a subscription as a gift.  *Id.* ¶ 4, n.1.  Those gift recipients can opt to skip the purchase portion of the MasterClass consent flow discussed below.  Plaintiff Alan Silva is one such gift recipient and, therefore, MasterClass does not seek to compel arbitration as to him.

[3] MasterClass's September 27, 2023 Terms of Service are attached to the A.V. Decl. as Exhibit B and remain publicly available on MasterClass's website at, https://www.masterclass.com/terms.

DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD

December 29, 2023, as now, MasterClass offered three annual subscription plans: Individual, Duo, and Family, each with a different monthly price.  A.V. Decl. ¶ 5 & Ex. A, at 1.  The monthly price associated with each plan varied over time (as did the subscription plan names) and the company periodically offered limited time discounts.  *Id.* ¶ 4.  On December 29, 2023, MasterClass was offering a 2023 End of Year promotion pursuant to which MasterClass subscriptions could be purchased at a 40% discount.  *Id.* ¶ 10.  Malaty-Uhr selected the Duo subscription plan, which was then being offered at a price of $9 per month, $108 annually.  *Id* ¶¶ 10-12 & Ex. A, at 1 (below).



After plan selection, Malaty-Uhr was prompted to create a MasterClass account.  *Id.* ¶¶ 6, 13.  To do so, she could:  Sign Up With Google, Sign Up With Facebook, or use an email address.  *Id.* ¶ 13 & Ex. A at 2.  Malaty-Uhr signed up with Google.  *Id.* ¶ 13.

Once she used her Google credentials to create a MasterClass account, Malaty-Uhr proceeded to the third step of the purchase process: payment.  *See id.* ¶¶ 6, 14-15.  Malaty-Uhr could select to pay for her subscription via credit card, PayPal, or AfterPay.  *Id.* ¶ 15 & Ex. A at 4.  She selected to pay via credit card.  *Id.* ¶ 15.

DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD

1    Malaty-Uhr was thereafter prompted, as shown in the image below, to enter her credit card

2  information on a screen that contained only a handful of objects: a summary of the plan Malaty-Uhr

3  was purchasing, a text box for Malaty-Uhr's credit card information, a notice that by clicking the

4  "Place Secure Order" button Malaty-Uhr was agreeing to the MasterClass Terms of Service, and a

5  red "Place Secure Order" button.  *See* A.V. Decl., Ex. A at 5.



22    In the middle of the screen, directly above the "Place Secure Order" button was contrasting

23  black text against a white background.  The text stated: "By clicking 'Place Secure Order,' you agree

24  to enroll in our annual subscription plan and to our Offer Terms[4] and Terms of Service."  *Id.* ¶ 16 &

25  Ex. A at 5.  Two additional sentences confirmed provisions related to the end of year promotion,

26  cancellation, and refunds.  *Id.*, Ex. A at 5.

27

28  [4] The Offer Terms set out the 2023 End of Year promotional terms.  A.V. Decl., ¶16 n.4 & Ex. C.

4

If Plaintiffs clicked on the hyperlinked "Terms of Service"—which were also provided as a hyperlink on the bottom of many of MasterClass's webpages—they would have been taken directly to MasterClass's Terms of Service dated September 27, 2023. *Id.* ¶ 17.

### 2. The MasterClass Terms of Service.

The MasterClass Terms of Service in effect on December 29, 2023 were last revised on September 27, 2023. *Id.* Those Terms, which remain in effect today, clearly and conspicuously notified users of the binding arbitration and class action waiver provisions. In the first paragraph of the Terms, titled "Introduction," the document provided in bold, capital letters:

> **PLEASE READ THESE TERMS OF SERVICE CAREFULLY, AS THEY GOVERN YOUR USE OF THE SITE AND SERVICES, PARTICULARLY [§] 10 (BINDING ARBITRATION; CLASS ACTION WAIVER), WHICH AFFECTS YOUR RIGHTS IN THE EVENT OF A DISPUTE BETWEEN US.**

*Id.*, Ex. B § 1.1.

Section 10, entitled "Binding Arbitration; Class Action Waiver," contained the full text of the arbitration agreement between MasterClass and its subscribers and further alerted users to the Section's importance stating (again) in capital letters: "PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE OR PARTICIPATE IN A LAWSUIT IN COURT." *Id.* § 10. Below this appeal, was the parties' full agreement to arbitrate. It set forth in clearly titled subsections the scope of the "mutual arbitration agreement," *id.* § 10(ii), the class action waiver, *id.* § 10(iii), and the arbitration procedures under which arbitrations would be conducted, *id.* § 10(iv)-(viii) (collectively, the "Arbitration Agreement" as defined in the Terms § 10). As applicable here, the Arbitration Agreement included the following provisions:

**<u>Scope</u>.** The Arbitration Agreement stated that, with limited exceptions,[5] it "govern[ed] any and all disputes between us including but not limited to claims arising out of or relating to any aspect of the relationship between us, the Terms of Service, or your use of the Services, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." *Id.* § 10(ii).

---

[5] Each party retained the right to bring claims within the jurisdiction of small claims court, to protect its intellectual property, and for certain injunctive or declaratory relief. A.V. Decl., Ex. B § 10(ii).

1    **Delegation Provision.**  The Arbitration Agreement also provided for submission to

2  arbitration, and the arbitrator, the "determination of the scope, enforceability, or applicability of this

3  Arbitration Agreement, including, but not limited to any claim that all or any part thereof of this

4  Arbitration Agreement is void or voidable, [and] whether a claim is subject to arbitration."  A.V.

5  Decl., Ex. B § 10(ii).

6    **Individual Arbitration.**  MasterClass also explained that the Arbitration Agreement

7  contained a class action waiver and required individual arbitration, stating:

8       YOU AND MASTERCLASS ACKNOWLEDGE AND AGREE THAT, TO THE
        MAXIMUM EXTENT ALLOWED BY LAW, EXCEPT AS SET OUT
9       OTHERWISE IN SUBPART (VI)[6] BELOW, ANY ARBITRATION SHALL BE
        CONDUCTED IN AN INDIVIDUAL CAPACITY ONLY AND NOT AS A
10      CLASS OR COLLECTIVE ACTION [. . . ].

11  *Id.* § 10(iii).

12    **Opt Out Right.**  Finally**,** the MasterClass Terms gave Malaty-Uhr a right to opt out of the

13  Arbitration Agreement by informing MasterClass of her decision to do so within 30-days of

14  accepting the Terms.  *Id.*, Ex. B § 10(x).  Malaty-Uhr did not exercise that right.  *Id.* ¶ 21.

15

16  **II.    ARGUMENT**

17    The Court should compel Malaty-Uhr to arbitrate her claims.  When she purchased a

18  MasterClass subscription, Malaty-Uhr agreed to MasterClass's Terms of Service and thus to arbitrate

19  any disputes related to her use of MasterClass's services.  Malaty-Uhr's VPPA claims are directly in

20  the scope of that Arbitration Agreement, which is valid and enforceable.  Her claims must be

21  arbitrated.

22  ―――――――――――――――

23  [6] In Section 10(vi), the Arbitration Agreement sets out procedures for mass arbitrations, defined as
    100 or more similar demands filed by similarly positioned claimants.  A.V. Decl., Ex. B § 10(vi).
    Those procedures continue to provide arbitration on an individual basis: per the Agreement, "[n]o
24  individual arbitration award or decision will have any preclusive effect as to issues or claims in any
    dispute with anyone who is not a named party to [an] arbitration."  *Id.* § 10(viii).  Each individual
25  claimant is moreover granted the right to opt out of arbitration *altogether* (for any reason) if, after a
    subset of 10 arbitration demands are adjudicated, the parties cannot reach a mediated settlement.  *Id.*
26  § 10(vii)-(viii).  These Terms are enforceable and do not affect the enforceability of a class waiver
    under the FAA.  *Cf. Heckman v. Live Nation Ent., Inc.*, No. 23-55770, 2024 WL 4586971 (9th Cir.
27  Oct. 28, 2024) (provider rules that "contemplate that cases with common issues or facts will be
    batched, and that 'batched' claims are not resolved by individual arbitration but are rather treated in a
28  'class or representative' fashion," are unconscionable; such arbitration is outside the FAA's scope).

A.      **The Federal Arbitration Act Governs the Arbitration Agreement.**

"[T]he Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). "By its terms, the [FAA] leaves no place for the exercise of discretion . . . , but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original); *see also Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004) (If a valid arbitration agreement exists, "the court must order the parties to proceed to arbitration . . . in accordance with the terms of their agreement."). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 938 (9th Cir. 2013) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

The FAA governs the Arbitration Agreement here. The FAA applies to any arbitration agreement that is (i) in writing and (ii) part of "a contract evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2. The requirement that an agreement "involve[s] commerce" is "broad" and "signals Congress' intent to exercise its Commerce Clause powers to the full." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273 (1995); *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003) (the FAA applies as long as the economic activity in question would in the aggregate represent "a general practice subject to federal control") (cleaned up). The "Internet is an instrument of, and intimately related to, interstate commerce," *United States v. Jackson,* 851 F. App'x 35, 36 (9th Cir. 2021), and courts regularly apply the FAA where a contract involves transactions and communications via the Internet. *See, e.g.*, *Ben-Avi v. Experian Info. Sols*, No. 23-cv-1317-BAS-BGS, 2024 WL 3610972 (S.D. Cal. July 31, 2024) (applying FAA to arbitration agreement between Experian and user).

The Arbitration Agreement between Malaty-Uhr and MasterClass satisfies both conditions required for the FAA to apply: (1) it is in writing; and (2) Malaty-Uhr's claims arise out of her use of MasterClass's online education service, which is made available throughout the United States,

7

1    including in Illinois, where Malaty-Uhr allegedly resides.  *See* SAC ¶ 15.  Moreover, the Arbitration

2    Agreement expressly encompasses the parties' agreement it was "made pursuant to a transaction

3    involving interstate commerce, and shall be governed by the Federal Arbitration Act ('FAA'), 9

4    U.S.C. §§ 1-16."  A.V. Decl. ¶ 20 & Ex. B § 10(ii).  So, the FAA applies.

5         **B.    The FAA Limits the Scope of the Court's Inquiry.**

6         Generally, a court's role under the FAA is limited to determining "two 'gateway' issues:

7    (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement

8    covers the dispute."  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v.*

9    *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  The party seeking to compel arbitration bears

10   the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.

11   *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1013 (9th Cir. 2024).  Although a court may not

12   consider the merits of the underlying claims "in deciding a motion to compel arbitration, [it] may

13   consider the pleadings, documents of uncontested validity, and affidavits submitted by either party,'"

14   such as the Declaration of Abhimanyu Vasishth and the exhibits attached to it.  *Macias v. Excel Bldg.*

15   *Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011).

16        Here, Malaty-Uhr purchased a MasterClass subscription and, as part of that process,

17   manifested assent to the company's Terms, which included binding arbitration and class action

18   waiver provisions.  Those Terms delegated questions regarding the scope of those arbitration

19   provisions to the arbitrator and, in any event, Malaty-Uhr's claims in the SAC are unquestionably

20   covered by it.  Accordingly, the Court must compel her to arbitrate those claims.

21        **C.    There is An Arbitration Agreement As Malaty-Uhr Assented to the Terms.**

22        Malaty-Uhr assented to and is bound by a valid, binding agreement to arbitrate disputes.

23   When deciding whether the parties agreed to arbitrate a dispute, courts apply ordinary state-law

24   principles that govern the formation of contracts.  *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 584

25   (N.D. Cal. 2020) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)).

26        The relevant state law for determining contract formation here is either California (where

27   MasterClass is headquartered and has its principal place of business, SAC ¶ 23, and which the Terms

28   identify in its choice-of-law provision, A.V. Decl., Ex. B § 10(v)), or Illinois (where Malaty-Uhr

8

alleges she resides, SAC ¶ 15, and where, presumably, she purchased her MasterClass subscription and viewed MasterClass lessons).  Because principles of contract formation in both states are substantively identical and (like most, if not all, other states) rely on an objective view of mutual assent, MasterClass assumes for purposes of this motion that the distinction does not matter.  *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015) (the contractual laws of New York, California, and Illinois "are substantively similar with respect to the issue of contract formation"); *cf. Whalen v. Facebook, Inc.*, No. 20-CV-06361-JST, 2022 WL 19934419, at *2 (N.D. Cal. Apr. 11, 2022) ("Although the parties dispute whether California or Illinois law applies, they agree that the two states' laws are consistent on the question of contract formation.").

A party seeking to enforce the terms of an online contract must show that the user had either actual notice of the contract terms or was on inquiry notice, meaning reasonably conspicuous notice of the terms and a manifestation of assent.  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (applying California law). "There are two typical internet contracts: (1) 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use and (2) 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen."  *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 483 (9th Cir. 2020) (quoting *Nguyen*, 763 F.3d at 1175-76 (cleaned up)).

A "hybrid" or "sign-in wrap" variation where a "user is required to affirmatively acknowledge the agreement before proceeding with use of the website" has also emerged.  *Ajzenman v. Off. of Comm'r of Baseball*, No. CV 20-3643 DSF (JEMx), 2020 WL 6037140, at *4 (C.D. Cal. Sept. 14, 2020) (quoting *Nguyen*, 763 F.3d at 1176).  Under California law, a sign-in wrap agreement is enforceable if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  The Ninth Circuit has explained that this test has two components: the context of the transaction and the visual aspects of the notice.  *Keebaugh*, 100 F.4th at 1019.  The notice MasterClass provided on its purchase screen meets both conditions.

9

### 1. A Typical Consumer Expects An Ongoing Relationship with MasterClass.

The context of a transaction, while not dispositive, "is an important factor to consider" when assessing the enforceability of an online sign-in agreement because it "is key to determining the expectations of a typical consumer." *Id.* (quoting *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 947 (2022)). "[W]hen [a] transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship, such as buying a single flower arrangement or pair of socks, downloading free software, or signing up for a free trial, the consumer is less likely to be looking for contractual terms." *Blizzard*, 76 Cal. App. 5th at 947 (cleaned up). But when, by contrast, the context "reflect[s] the contemplation of some sort of continuing relationship that would [] put users on notice for a link to the terms of that continuing relationship." *Keebaugh*, 100 F.4th at 1019.

Here, MasterClass presented Malaty-Uhr with the option to buy an annual—*i.e.*, 12-month—subscription; it was not a trial subscription nor was it free. *Cf. Blizzard*, 76 Cal. App. 5th at 947. Malaty-Uhr purchased a subscription at a cost of $108.00, A.V. Decl. ¶ 10, which granted her "unlimited access to thousands of *bite-sized* lessons." Homepage, https://www.masterclass.com/ (emphasis added). The concept of "bite-sized lessons" available in a user-selected format is the core of MasterClass's model: MasterClass allows users to sign in and learn whenever and however is most convenient for them, with new lessons added monthly. *Id.* ("Watch on your computer, TV, phone, or tablet[;] Learn on the go with audio-only lessons[;] Download and watch offline (select plans)."). The user's ability to download changing content, and to access it on demand over a 12-month period, suggests to a typical user that a subscriber relationship with MasterClass is ongoing and subject to terms and conditions. *See Keebaugh*, 100 F.4th at 1020 ("No reasonably prudent internet user—one who is likely often exposed to similar online agreements—would consider downloading and playing a potentially endless mobile game to be equivalent to an insular and discrete one-time transaction."). And, indeed, MasterClass records reflect that Malaty-Uhr has watched or listened to about 15 hours of MasterClass content on more than 70 separate dates. A.V. Decl. ¶ 10. In short, Malaty-Uhr was presented with a forward-looking, ongoing relationship with MasterClass (of which she took

advantage) and a reasonable user would have been alerted at the time of purchase that terms and conditions would govern the parties' relationship.

### 2. *Malaty-Uhr Received Visually Conspicuous Notice of the Terms.*

Malaty-Uhr likewise received visually conspicuous notice she was agreeing to the Terms when she purchased her subscription. Whether notice in an online agreement has visual aspects that are reasonably conspicuous and reflect a manifestation of assent "depends on the design and content of the website," *i.e.*, "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design." *See Nguyen*, 763 F.3d at 1177. Notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856. And, if there is a hyperlink, "the fact that [it] is present must be readily apparent." *Id.* at 857. Comparing the notices in two Ninth Circuit cases, *Berman* and *Keebaugh* illustrates how courts should apply these criteria.

In *Berman*, the Ninth Circuit affirmed the district court's refusal to enforce two separate sign-in agreement prompts (depicted below) because they did not provide reasonably conspicuous notice




DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD

1    and "did not indicate to the user what action would constitute assent to [the company's] terms and

2    conditions." *Berman*, 30 F.4th at 856, 858 (for images below, *see id.*, Apps. A & B).

3    Among other issues, the Ninth Circuit found that the textual notice was: displayed "in a tiny

4    gray font . . . so small that it [was] barely legible to the naked eye," surrounded by "comparatively

5    larger" text that "naturally direct[ed] the user's attention everywhere else," and "sandwiched"

6    between a "large green button with text that stated, in easy-to-read white letters, 'Continue»'" and

7    other objects. *Id.* at 854, 856-57; *see also* Apps. A, B.  The notice was "further deemphasized by the

8    overall design of the webpage" which had several other brightly colored visual elements that "dr[ew]

9    the user's attention away from the barely readable critical text." *See id.* at 857.  Finally, the notice

10   failed to alert users that by clicking the "Continue" button they would manifest assent to the terms.

11   "A user's click of a button can be construed as an unambiguous manifestation of assent only if the

12   user is *explicitly* advised that the act of clicking will constitute assent." *Id.* at 857 (emphasis added).

13   In *Keebaugh v. Warner Brothers*, on the other hand, the Ninth Circuit held the company's

14   notice (which changed over time, and one version of which is depicted below) *was* reasonably

15   conspicuous.  100 F.4th at 1011.



DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD

1      In reaching this holding, the Ninth Circuit reviewed California law and held an online sign-in

2   agreement was enforceable if notice was "not in extremely small print, lacking contrast, . . . outside

3   the area where the consumer's attention would necessarily be focused," and "did not rely on a

4   visually nondescript hyperlink." *Id.* at 1016-17 (quoting *Blizzard*, 76 Cal. App. 5th at 954).  Based

5   on these criteria, the Game of Thrones prompt "satisf[ied] the visual requirements to provide

6   conspicuous notice that a reasonably prudent Internet user would have seen." *Id.* at 1020.  It was

7   presented directly beneath the operative button with text notifying the user that an action, "tapping

8   'Play,'" constituted agreement to the terms.  Moreover, the notice's design "use[d] 'a contrasting font

9   color' making the notice legible on the dark background," lacked "clutter," and followed "customary"

10  design elements to denote the existence of hyperlinks.  *Id.* at 1020-21.

11      The MasterClass purchase prompt, like the notice in *Keebaugh*, meets these criteria and is

12  visually on a par with notices upheld by district courts.  As shown in the image in the Background

13  Section above (and Exhibit A to the Vasishth Declaration), at payment, MasterClass presented

14  purchasers with a visually uncluttered screen, writing in dark font against a contrasting white

15  background, and only one section of text: an explicit notice alerting users that "*By clicking 'Place*

16  *Secure Order'*" they would be subject to MasterClass's "Terms of Service," a hyperlink identified by

17  partially capitalized letters and underscoring.  District courts routinely uphold similar notices under

18  this binding precedent.  *See, e.g., Pizarro v. QuinStreet Inc.*, No. 22-cv-02803-MMC, 2022 WL

19  3357838, at *3 (N.D. Cal. Aug. 15, 2022) (see **App. Image 1** below) (sign-in agreement gave

20  conspicuous notice even though hyperlink was "the same [grey] color as the rest of the textual

21  notice" because it was "underlined and adequately contrasted with the white background"); *Chien v.*

22  *Bumble Inc.*, 641 F. Supp. 3d 913, 935 (S.D. Cal. 2022) (see **App. Image 2** below) (grey, underlined

23  hyperlink sufficiently conspicuous); *see also Ghazizadeh v. Coursera, Inc.*, No. 23-cv-05646-EJD,

24  2024 WL 3455255, at *10 (N.D. Cal. June 20, 2024) (see **App. Image 3** below) (hyperlink, though

25  not underlined, was dark gray and bolded and "adequately contrast[ed] with the light gray

26  background such that a user would not 'be required to hover their mouse over otherwise plain-

27  looking text or aimlessly click . . . to ferret out hyperlinks'" (quoting *Berman*, 30 F.4th at 857)).

28

**D.    Malaty-Uhr's Claims Are Within the Scope of the Arbitration Agreement.**

Under the FAA, if a valid arbitration agreement exists, the only remaining question is whether the claims are within the agreement's scope.  Here, MasterClass Terms delegate that question to the arbitrator in the first instance.  But, in any event, Malaty-Uhr's VPPA claims are arbitrable.

*1.    The Parties Delegated Arbitrability to the Arbitrator.*

The MasterClass Terms include a delegation clause requiring that any argument Malaty-Uhr may have about the arbitrability of her claims—including the "determination of the scope, enforceability, or applicability of this Arbitration Agreement," whether any part of the Arbitration Agreement "is void or voidable," and "*whether a claim is subject to arbitration*"—be decided in the first instance *by the arbitrator*.  A.V. Decl. ¶ 20 & Ex. B § 10(ii) (emphasis added).  Thus, if the Court finds that Malaty-Uhr entered into the Arbitration Agreement, it should compel arbitration of her claims without reaching the merits of any objection to arbitrability she may raise.

Before deciding an arbitrability challenge, a court must examine the contract to determine whether the parties have agreed to commit arbitrability to the arbitrator.  *See Rent-A-Ctr., W., Inc. v. Jackson,* 561 U.S. 63, 70 (2010) ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.").  "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).  Parties may delegate arbitration if their agreement does so "clear[ly] and unmistakabl[y]."  *Id.* at 69 (citation omitted); *Momot v. Mastro*, 652 F.3d 982, 987-988 (9th Cir. 2011).

The parties here delegated issues of arbitrability to the arbitrator in clear and unmistakable language. The Terms delegated disputes over the "scope, enforceability, or applicability" of the Terms, including, but not limited to, any claim that all or any part of the Terms were "void or voidable," and "whether a claim is subject to arbitration" to the arbitrator.  A.V. Decl. ¶ 20 & Ex. B § 10(ii).  Such language is "clear and unmistakable" evidence of the parties' intent to submit threshold issues to the arbitrator.  *See*, *e.g., Mohamed v. Uber Techs., Inc*., 848 F.3d 1201, 1209 (9th

1    Cir. 2016) (clause stating "arbitrators [had] the authority to decide issues relating to the

2    'enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration

3    Provision' . . . 'clearly and unmistakably indicate[d] [the parties'] intent'" to delegate arbitrability);

4    *Momot*, 652 F.3d at 987-88 (clause stating arbitrator had the authority to determine "validity or

5    application of any of the provisions" was "clear and unmistakable" delegation of arbitrability).

6              **2.  *Malaty-Uhr's VPPA Claims Are Arbitrable.***

7              Last, and although the Court need not and should not reach the issue, Malaty-Uhr's claims fall

8    within the scope of the Arbitration Agreement.  The FAA requires courts to compel arbitration

9    "unless it may be said with positive assurance that the arbitration clause is not susceptible of an

10   interpretation that covers the asserted dispute."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475

11   U.S. 643, 650 (1986).  Under the FAA, "as a matter of federal law, any doubts concerning the scope

12   of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone*, 460 U.S. at 24–25.

13             Here, Malaty-Uhr agreed to an expansive arbitration agreement that covered "any and all

14   disputes between [Malaty-Uhr and MasterClass] including but not limited to claims arising out of or

15   relating to any aspect of the relationship between [them], the Terms of Service, or [Malaty-Uhr's] use

16   of the Services, whether based in contract, tort, statute, fraud, misrepresentation or any other legal

17   theory."  A.V. Decl. ¶ 20 & Ex. B § 10(ii).  Malaty-Uhr's VPPA claims—which allege that

18   MasterClass committed a statutory tort when she purchased her subscription and viewed video

19   content on the website thereafter—is within the scope of this broad Agreement.  *See Atencio v.*

20   *TuneCore, Inc.*, 769 F. App'x 432, 433 (9th Cir. 2019) ("The 2012 Agreement contains an arbitration

21   clause that encompasses '[a]ny controversy arising out of or relating to this Option Agreement.' We

22   construe such a clause broadly.").  Malaty-Uhr's claims are subject to mandatory arbitration.

23   **III.    CONCLUSION**

24             For these reasons, the Court should compel arbitration of all claims Plaintiff Malaty-

25   Uhr alleges in the Seconded Amended Complaint pursuant to the terms of the parties'

26   arbitration agreement and dismiss them without prejudice.

27

28

Dated: November 14, 2024                    **ZWILLGEN PLLC**

By:  _/s/ Dana J. Brusca_
       Dana Brusca (*Pro Hac Vice*)
       dana@zwillgen.com
       Sheri B. Pan (SBN 316136)
       sheri@zwillgen.com

       **Attorneys for Defendant**
       Yanka Industries, Inc. d/b/a MasterClass

1

**APPENDIX**

2

*Image 1*

3

*Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838, at *1 (N.D. Cal. Aug. 15, 2022)

4

5

6

7

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Image 2*

*Chien v. Bumble Inc.*, 641 F. Supp. 3d 913, 934 (S.D. Cal. 2022)



DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD

*Image 3*

*Ghazizadeh v. Coursera, Inc.*, 2024 WL 3455255, at *5 (N.D. Cal. June 20, 2024)



DEFENDANT'S MOTION TO COMPEL ARBITRATION; CASE NO. 3:24-cv-05264-JD